Thank you very much, your honors. Good afternoon, my pleas to court. My name is Roger Javier, and I represent the plaintiff and appellant, Miss Ina Rodman. Your honors, I am reserving two minutes for rebuttal time. I will monitor it myself. Thank you. We ask that you reverse the decision of the trial court for two reasons. First, the district court erred in excluding Dr. Plunkett's expert opinion regarding the adequacy of the Abilify label as it relates to Tardive Dyskinesia. And second, the district court erred in granting summary judgment, particularly when there was evidence demonstrating that the Tardive Dyskinesia warning label was inadequate. Your honors, I'd like to point this court out to seven critical facts. First, plaintiff was diagnosed with major depressive disorder and was being prescribed Abilify as early as 2010, and she continued to be prescribed Abilify through 2015. Second, she was diagnosed with Tardive Dyskinesia by her neurologist, Dr. Annette Nieves, who testified that Abilify caused her Tardive Dyskinesia. Third, Tardive Dyskinesia is a serious and often irreversible neurological condition characterized by uncontrollable facial movements. Fourth, while the FDA requires manufacturers of drugs to post marketing experiences related to the drug for adverse effects like Tardive Dyskinesia, the defendant failed to do so even though it had information as early as 2006 showing a concerning link between Tardive Dyskinesia and Abilify. Fifth, in fact, in 2014, your honors, the defendant literally removed Tardive Dyskinesia from the adverse reaction section of the label and even removed the incidence rate. Sixth, importantly, the plaintiff's prescriber testified that the incident rate would, if it was higher than reported, would have given him pause regarding the prescribing the drug. And finally, your honors, seven, the gist of Dr. Plunkett's opinion is that while the FDA requires a manufacturer's label to continue to reflect current knowledge concerning the risks posed by the drug, in this case, the defendant, when faced with a lot of research showing a higher experience with Tardive Dyskinesia as it relates to Abilify than other and hence the label is inadequate, particularly when the manufacturer removed Tardive Dyskinesia from its adverse reaction section in the label. Your honors, with regard to the first issue, Dr. Plunkett should not have been excluded. Her opinion, of course, is essentially that Tardive Dyskinesia warning label is inadequate. As this court is aware, the standard for appellate review of a district court's decision to exclude an expert is abuse of discretion. Further, this court in United States v. Morales held that an abuse of discretion occurs when the district court bases its decision on an erroneous view of the law or a clearly erroneous assessment of the facts. Let me ask you, let me ask you this about your own expert. The district judge did characterize his action as excluding her, but I think it's probably fair to say that he qualified her as an expert, but said the testimony or evidence that she offered was not provative of the point that was relevant to the case, which is to say the incidence of Tardive Dyskinesia resulting from the use of Abilify. What's wrong with his doing that? There's several different reasons that why his analysis was wrong, Judge Fletcher, and in this particular case, you're right, he does acknowledge Dr. Plunkett's expertise and ability to testify, but what he does say is that on page 10 to 12 of his judgment, that she extrapolated conclusions beyond the scope of her sources, and your honors, the reality is she did no such thing. Rather, her testimony and report are consistent, and they stand for that proposition that while the manufacturer is the only, and I repeat the only entity which could establish a true incidence rate, the fact that the studies, there were studies out there that raised concerns with Abilify, the fact that the adverse reaction section made it inadequate. Now, can I ask you about that? You made a point that they completely remove it in 2014. How is that relevant to the administration of the drug? Because she began getting out much long, long before that. That is correct, but the critical time is not one point in isolation, Judge Fletcher. It's during the course and during the pendency of her taking the drug, is that which is relevant. Think this in mind, if you're sitting taking the drug yourself, and the manufacturer removes a particular condition from an adverse reaction section, then you're put under a false sense of belief regarding that particular condition. And the sources in this case, your honor, importantly, relied on by Dr. Plunkett with regard to her methodology in evaluating the sufficiency or lack thereof of a warning label, are often the only sources available out there to assess the risk of a condition like this. Some of her sources are found on page 10 to 11 of her report, and regardless, your honors, if you look at the end of her report, she lists all 38 of her references that she relies on. But here's the question I have about that, and I think this is what the district court was getting at, was the incidence rate, it's a ratio of the number of people who took Abilify and had Dr. Plunkett looked at two studies that arguably bear on the first of those numbers, but did not have the second number. And she didn't have any other source for the second number. And so it seems like what the district court was saying is, whatever she's doing, it can't possibly be calculating an incidence rate. So what's wrong with that line of reasoning? Judge Miller, everything was wrong with that. In your analysis, relative to the judgment is 100% that's what the trial court found, but this is what's important. One thing to keep in mind is that the only entity that is able to provide you with an incidence rate is the manufacturer, specifically Judge Miller, to your point, which is because the manufacturer is the only one that knows the total amount of people that took Abilify. Then you could have gotten that from them in discovery, couldn't you? I mean, assuming that's true, it's not unknowable to you. Interesting point that you noted as well, because the reality is this, what is required by law is label documentation, post-marketing studies. So what we do show in the label is a reflection of nothing. After there was a series of scientific data and studies showing an alarming concern with regard to tardive dyskinesia and its relationship to Abilify. That's what's important. You are not required by law because it's impossible for an individual to establish an incidence rate, particularly when the manufacturer is the one that can do it. What Dr. Plunkett can only do, your honors, is to take scientific research, take a look at it, and actually go from there and see what was done after the post-marketing experience. That's the thing that's important. Simply stated, Judge Miller, what an incidence rate in preclinical studies does is observe the risk of tardive to observe the risk after it's introduced to the public, and more importantly, to see if there is a greater risk and if there's something that's concerning, and importantly, whether or not the manufacturer took any steps to note anything in its label, and in fact, as it did not. Importantly, your honors, this information that Dr. Plunkett does, meaning reviewing scientific literature, the FAERS data, are often the methodology she uses across the board in order to assess whether or not the label is inaccurate. As a matter of fact, in Terry v. McNeill, the district court in Eastern District of Pennsylvania acknowledged Dr. Plunkett's ability to use information such as scientific data, such as the FAERS data, to make an opinion as to whether or not the label is adequate. Importantly, your honors, the defendant cites to no case that stands for the proposition that experts cannot compare incidence rates with other data for the purposes of conclusions regarding the adequacy of the drug, and the reasons why it's quite simple. Can I interrupt with another question? Without question. I'm looking at Dr. Carroll's paper in which Dr. Carroll, I'm at 2 ER 34, he's got a table, and he lists, he gives the generic name, and he says, mean actualized TD targeted dyskinesia incidence of 1.7. Now, in your brief, you say that's not actually an incidence figure. Why do you say that? Because the only entity that's able to do the incidence rate, your honor, is actually the manufacturer. Carrell's study is extremely important, though, because what his study shows is the potentially higher risk of contracting TD associated with Abilify. That's extremely important, all right? And I see in your papers, you tried to distinguish between risk and incidence. What do you mean when you're making that distinction? The, it's very important from a scientific standpoint, Judge Fletcher. The difference between risk and incidence is the following. The incidence rate is that only able to be produced by the manufacturer. Everything other one, everything else outside of that will be a risk, an occurrence, an observation, and things of that nature. Well, it seems to me in your briefing, you essentially walk away from this 1.7% incidence reported by Dr. Carrell, when I don't understand why you're walking away from it. Because what we have is that during the period that they were reporting some incidents, they were saying between 0.1 and 1.0, and this is 1.7. If that's your central argument, or if that's your best argument, you sure managed to run away from it. And we're certainly not running away from it. If the brief kind of characterizes, it gives you the impression of otherwise, my apologies for that. Dr. Carrell's report is important for that very, for that very position, Judge Fletcher, position being this, that the incidence rate of tardive dyskinesia is likely higher than that reported in the label. And that's entirely what our point is. The importance in this case, your honors- You didn't make that point very clearly to the district court. I'm sorry, your honor? You certainly did not make that point very clearly to the district court, and you buried under the last three pages of your very long blue brief to us. Again, my apologies. It wasn't intentional. I can assure you at the district court level, my argument was the same with regard to Dr. Carrell's position. And this position, and our position is this, Dr. Plunkett uses documents such as those type of studies to formulate her opinion and to see what was done by the manufacturer post-marketing. And if there was nothing done in the label, then that is her opinion with regard to the weaknesses or inadequacies of it. May I just ask, just to be clear, if we were to agree that the district court was right in excluding Dr. Plunkett, what would you point to to show that you should nevertheless have survived summary judgment? All right. If this court were to uphold the denial of Dr. Plunkett, then regardless, during the time that the drug was being taken by the plaintiff, the manufacturer absolutely, without question, removed tardive dyskinesia from the adverse reaction section of the label. And that's something that doesn't require an expert opinion to make a determination. However, Judge Miller, that is something that certainly a jury could find is inadequate for purposes of the California Products Liability Act. How could they find it was inadequate without something that says that there's a risk that required warning about it? Well, simply because, Judge Miller, first of all, there is a class warning about it, but it's removed from the adverse reaction section. And the question would then become the removal from the adverse reaction section. Does it bear any responsibility for the damage caused to the plaintiff? Simply stated, is it a material fact that the label failed to contain warnings in the adverse reaction section at the time the plaintiff took the drug and ultimately developed tardive dyskinesia, the condition which was removed from the label? We believe that's absolutely an issue. And in that scenario, Judge... But it's not tortious to not warn about something unless there's a danger that requires warning. And my question is, without Dr. Plunkett, what establishes that there was a risk that required a warning? Well, again, once there's a determination and acknowledgement that it's not located in the adverse reaction section, then it falls upon the prescriber to provide that evidence as to whether or not he would continue to prescribe it in light of the fact that it wasn't even there. And in this particular case, the doctor said he would have given pause had he been aware of the fact that there was a potentially higher incidence rate. You know, I'll give you one last chance to answer Judge Miller's question. Is there any evidence in the record that shows risk or incidence? Well, and so he's asking, what is it? OK, well, that's Judge Fletcher. There's distinction between the question he was asking me about, you know, versus the risk. With regard to the incidence risk, the only thing that's in the record is the information provided in the label that shows the incident rate that was provided in the clinical studies. There is a ton of information and a wealth of information showing that that risk is potentially higher, including Judge Fletcher, as you pointed out, Dr. Carell's report. And I know I reserve some time and I see I'm beyond it. I'll I'll just adhere my succeed my time right now in this. Yeah, let's let's hear from the other side and we'll give you a chance to respond. Thank you. May it please the court. My name is Matt Campbell on behalf of the appellee, Otsuka America Pharmaceutical, Inc. With the court's indulgence, if I could just spend two quick minutes setting the stage about Abilify, the warning that exists and what the appellant's claim is. My client developed and marketed Abilify, which is an antipsychotic medication that's been approved by FDA to treat serious mental health diseases since it was first marketed in 2002. And Abilify, the label is always carried, even today, a full page warning informing doctors and patients that, among other things, Abilify can cause tardive dyskinesia, that the risk of tardive dyskinesia increases the longer a patient takes antipsychotic medications and is highest among elderly women. And that is unknown whether Abilify or other antipsychotic medications like it differ in their potential to cause tardive dyskinesia. That is right up front in the warnings and precautions section. What Dr. Plunkett concedes is the most important part of the label. Ms. Rodman was, as they talked about, was prescribed Abilify when she was 60 years old. She took the medication for about five years and at one point described it as a godsend to her. But shortly after she stopped it for financial reasons, she began to develop symptoms of tardive dyskinesia. Rodman claims that Abilify, that OTSCA failed to warn the risk of tardive dyskinesia. She ignored this full page warning that has been there the entire time. And she focuses on a table in the section of the label discussing the Abilify clinical trials. That table listed tardive dyskinesia as one of a number of side effects that occurred, had occurred infrequently. That is between 0.1% and 1% of patients during the clinical trials. Interestingly, Dr. Rodman, or Rodman's doctor, Dr. Hawkins testified that he doesn't even recall ever seeing that table and that it played no role in the decision to prescribe Abilify. Moreover, no one here is claiming that that was an inaccurate description of what OTSCA saw during the Abilify clinical trials. Everyone agrees that's what happened during the clinical trials. What Rodman is claiming is that in the real world, tardive dyskinesia occurs more frequently in Abilify patients. She alleges that missing from the label was some indication that the medication, the fact, her word that the occurrence rate for tardive dyskinesia was much higher. To prove this claim, she's got to show that the rate of tardive dyskinesia among Abilify users is actually higher than 1% and that had her doctor been told of the actual incidence rate, he would not have prescribed Abilify to Ms. Rodman. Both elements require an actual incidence rate. The district court found, as the court has noted, that there was a lack of proof of that incidence rate. Namely, she found no evidence of any actual rate that was higher and that Dr. Plunkett's claimed otherwise wasn't supported by this. The district court didn't abuse her discretion. This decision was based on a proper application of the Daubert standard, and most importantly, it was based on unequivocal evidence. Indeed, Dr. Plunkett's own admissions about what the sources she relied on couldn't do. I want to quickly address some questions that came up. First, if I could, the Correll study. The Correll study is important. The Correll study can't establish a genuine dispute. I think it's important to understand where the Correll study fits in here. First, this argument, the plaintiff did not raise this argument on the summary judgment. It was only raised later. Dr. Plunkett never relied on or even cited the Correll study in her expert report. Rodman did not make this argument in opposition to the summary judgment motion. It was only after the district court granted summary judgment that Rodman made the argument on reconsideration and submitted an affidavit that for the first time had Dr. Plunkett discussing the study. The district court found there was no excuse for Rodman failing to make this argument. In fact, this study had been cited by defendant's expert, by Otsuka's expert. In fact, Otsuka's expert is Dr. Correll, one of the authors of the study, and yet Rodman never cited it until reconsideration. The court didn't abuse its discretion in declining to reconsider this evidence that was submitted untimely. But I think it's very important to understand the Correll study does not support Dr. Plunkett's opinion. In fact, Dr. Correll opined that this study was consistent with a clinical trial experience described in the Abilify label. He explained that the study showed the data that they collected showed an observed incidence rate of tardive dyskinesia among Abilify users of 0.9%, consistent with the range mentioned in the label. The study also calculated, used that observed incidence rate to calculate and translate that into an annualized incidence rate. It's that figure that Rodman seizes on, the 1.7% figure that she seizes on here. The problem that they have is one, it was untimely. They never relied upon it. And second, there's no evidence in this case that a 1.7% annualized incidence rate would have ever mattered to Rodman's doctor. Under California law, a case like this has to prove that there's some inadequate information and that inadequate information, had it been disclosed, would have prevented the incident. Let me interrupt you for just a minute. Putting to one side the question, which is an important one, as to whether Dr. Hawkins would have acted differently had the incident report been different in the labeling. Putting that to one side, I understand it's an important question, but I'm not addressing that for the moment. Is the 1.7 figure given in the Correll study inconsistent with what was said on the label, that is to say the incidence is between 0.1 and 1.0? It is not because the rate that was disclosed was the rate observed during the course of the clinical trials. It did not represent or purport to represent an annualized incidence rate. The label says, and this is very important, and everyone knows this, that the longer you take the medication, the higher your risk is going to be. Of course, you have to know how long you're talking about. Over the course of 30 years, the risk is going to increase. This is very clearly disclosed in the label. What was reported in that table was talking about the rate that occurred during those clinical trials. Those clinical trials, I think, typically were about six months. That's exactly what Dr. Correll reported in his study. He looked at other clinical trials and those and found that the rate was 0.9%. He then annualized it because, as I understand it, that is one way to compare apples to oranges in these clinical trials and came up with 1.7. But that is not inconsistent with the rate that was reported on the clinical trials or the label because the label never reported that as an annualized incidence rate. Please explain for me the difference between the rate and the annualized rate. What do you mean when you say annualized? So, an annualized rate is over the course of a single year, how many people would get tardive dyskinesia, whereas the studies would have… Take a study that lasted six months and you report that in this study… Let me back up and make sure I understood what you just said. That is to say, out of a population of all the Abilify users, the annualized rate says that during any given year, 1.7 will develop tardive dyskinesia. That is to say, we're looking at the entire pool or are we looking at individuals? I don't understand yet what you mean. Doctor, what was reported in the label was the experience of the clinical trials. What Dr. Carell did in his study was also the experience of those clinical trials as well as other clinical trials. No, I'm asking you for the definition of annualized. What's that mean? Yes. So, the definition of annualized is how many people one would expect to… What percentage of a population taking Abilify would one expect to get tardive dyskinesia  If they all took it for a year. Yeah, that's my understanding of it. What was reported in the trials was the rate that experienced it during the trial. Those trials are clearly disclosed in the label the length of those trials. They're six-month periods of trial. It's clearly disclosed in the label that the longer you take a medication or this type of medication, the higher your rate over time is going to be of tardive dyskinesia. This is not in dispute. And what Carell did is he took a look at all the studies and he calculated that 0.9% of the patients in those studies experienced tardive dyskinesia. But he also observed what the annualized incidence rate observes is that those studies did not all last the whole year, for example. And to have a number that would allow you to compare apples to oranges, you would be able to do this. But I think it is very important to understand the Carell study is not something that Dr. Plunkett ever cited before this. It is not actually evidence that was ever a part of this. It's not evidence that was ever shown to Dr. Hawkins. Dr. Hawkins testified that he didn't have any idea what the incidence rate of tardive dyskinesia was with the Bill of Fibations. Well, that's part of the problem. So what you're saying is, if I hear it, is that if you looked at the label, you could not tell what the incidence rate would be for someone who took this drug for a year. That's correct. It doesn't disclose that information. That's not typically disclosed. And if you look at the label, I think it's very important for the court to look at the actual warning label that the FDA approved. And in that, it makes some very important things. The longer you take it, the more your risk is going to be. Prevalence estimates can't be used to determine whether any individual patient is going to get it. We don't know whether Abilify or any others has a lower or higher rate of tardive dyskinesia. And it says you need to monitor because this can come up with any patient. That's what the warning label has always said and still says to this day. Did the label indicate that there was a higher risk for older women? It did. The label included also that there is a higher risk for elderly and especially elderly women. And that's the category that Ms. Rodman fell into. The other issue I'd like to get is the claim that plaintiff's counsel makes about this being an impossible set of data to do. This is not an impossible task. There are many possible ways to calculate an incidence rate. I think one of the problems with Rodman's counsel's presentation is that it misunderstands that you can do this by sampling. It assumes that the only way to calculate an incidence rate is literally to count every single person who ever had the medication and then count how many of those people had tardive dyskinesia. We all know it's in all sorts of references. You can do this by sample. Dr. Plunkett admitted you could do it by sample. You could find 1,000 people taking Abilify. You could find 100 people taking Abilify. And then just count of that set, how many of them had tardive dyskinesia. Right there, you would have the data you would have. There's always an argument about whether or not that is transferable or generalizable. There's things like that. But you have to at least do something like that. And it's something that Dr. Plunkett could have done or Rodman could have asked Dr. Plunkett could have done or to do. Also, Dr. Rodman, as the court noted, at any point in time, Rodman could have asked OTC for the data on how many prescriptions of Abilify have been filled in the United States or where have you to be able to try to come up with some measure of a rate. And she never did this. If I can move on, I do think it's important. Very quick note. I do think it's important on the proximate causation point. I know the court didn't reach this because it didn't have to because it excluded Dr. Plunkett's opinion. But these things do go hand in hand. This is an inherent problem with the claim that at no point in time, as the plaintiff found evidence of an instance rate that's higher than that and then showed that to the doctor and asked whether or not that would have made a difference. That's the basic thing that needs to happen in this case. And that's never happened. They were never shown the Pena study. They were never shown the FAERS data or Dr. Hawkins was never shown those and asked, would this have changed your mind? That is very important because Dr. Hawkins testified that there's all sorts of factors. You'd like to see the study. There's all sorts of factors that might affect whether or not he would have continued to prescribe the medication. I'm not sure that quite reflects my understanding of the record. Maybe he wasn't shown the studies, but I do believe he was asked if you had known that there was a higher incidence, would that have made a difference? Wasn't he? He was asked two things about this. There's two elements of the testimony on this. One first was he testified that he would be much less likely to prescribe a medication just generally if he thought that 50% to 75% of patients got tardive dyskinesia. That's one answer that they were able to get from Dr. Hawkins. Obviously, that's not relevant here. No one is claiming anything like that. The second thing that they asked is asked Dr. Hawkins if he was told that one in 12 or 8% of Abilify patients developed tardive dyskinesia. But his testimony there was more equivocal. And again, it's the plaintiff's burden to prove this. He said, I think about it. It could affect my clinical decision making. Again, the problem, though, is there is nothing in the record that gets close to 8%. That is the problem here. Obviously, in any situation, I think a plaintiff's counsel could very easily get a doctor to say there is some factor out there that could have caused me to change my mind. And that's not what you do. You don't show that there's something about the label that is somehow not completely accurate and then ask the doctor, well, you can imagine some information that could change your mind, right? Yes, I'm done. That's essentially what they've done here. They never asked the doctor whether any of the rates they were talking about with any of the source material with all of its problems would have ever changed his mind. And they had to do that. And if I could just, I think this is fairly obvious from the record, but just I would want to make two quick points about what this data is. This is not a case where we're talking about data that is flawed or there's a criticism of the data. This is a very different case. This is a case in which by the plaintiff's expert's own admission, she doesn't have data on the one question that matters. And I think that the court's observation that you could say that her opinion is qualified and reliable, but just not probative or relevant is another way to analyze this. Whether you say that she is testifying that the rate is higher, but she has no proof for it. And so it's not a reliable opinion or whether she was going to go and testify that I've seen this data that doesn't tell me anything about the instance rate. And I want to tell the jury that that's not probative of the claims here. There are two different ways, I think, to assess it. Both are true in that sense, because the underlying problem is there is no evidence anywhere in the record that the incidence rate is higher than what was disclosed in the clinical trials. I think my time is up. Okay. Thank you very much. Now, you went very close to the end. Why don't we put two minutes on the clock for rebuttal? Thank you, Your Honor. I just want to point this court's attention to several key points, starting with the reality of what the law is. The law requires, Your Honors, for a label not to be misleading in any particular manner. Further, let me ask you this. The label that you're talking about, the 0.1 to 1%, I've just heard it being described as that's what happened in the six month clinical trial. Is that accurate? That is correct. Well, that's very different than from what happens over a longer period. Is it also correct that in the package insert, there are labels about the longer you take it, the higher the chance, and is particularly dangerous to older women? There are comments relative to that, Your Honor, but the point in this case is the reality that once they have it in their clinical trials, and against the fact that the studies post-marketing, once the drug came into the market, there was an abnormally high amount of frequency relations between Tardive Dyskinesia and Abilify, and the fact is the manufacturer did nothing. That's the point, and that is what Dr. Plunkett acknowledges. If you look at her testimony, she will acknowledge that Tardive Dyskinesia is the second most frequented adverse event of this drug, and they still took it out of the adverse reaction section. They can't do that. Under the law, the label cannot be misleading in any way. Under California Supreme Court case Sindel v. Abbott, the court requires and the law requires the manufacturer to make sure it has a continuing duty to update and maintain its label. The reality, Your Honor, is once it hit the market, they did nothing, and that is the  In Terry v. McNeil, the court allowed Dr. Plunkett to testify to matters like the FAERS data and scientific studies to challenge a label. The important thing is that this goes to the weight of her testimony, not the admissibility of it. With respect, Your Honor, we request that you reverse the decision of the lower court. Thank you. Okay. Thank both sides for their arguments. Rodman v. Otsuka America Pharmaceuticals now submitted for decision. That completes our arguments for this afternoon, and we are in adjournment. Thank you very much.
judges: SCHROEDER, FLETCHER, MILLER